J-A26038-22

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellant | : | |
| | : | |
| v. | : | |
| | : | |
| RICARDO DUPLESSIS | : | |
| | : | |
| Appellee | : | No. 2601 EDA 2021 |

Appeal from the Order Entered November 17, 2021
In the Court of Common Pleas of Philadelphia County
Criminal Division at No(s): CP-51-CR-0007098-2021

BEFORE: BOWES, J., KING, J., and PELLEGRINI, J.[*]

MEMORANDUM PER CURIAM:                    **FILED MARCH 3, 2023**

Appellant, the Commonwealth of Pennsylvania, appeals from the order entered in the Philadelphia County Court of Common Pleas, which granted the motion to quash filed by Appellee, Ricardo Duplessis, and dismissed the charges brought in the criminal information. We reverse and remand.

The trial court set forth the relevant facts of this appeal as follows:

> On December 30, 2020, Alphonzo Anderson ("Decedent"), was shot and killed at 1109 Rosalie Street. [Appellee] was arrested and charged with Murder and associated charges on January 4, 2021. A preliminary hearing was held on August 9, 2021, where the Commonwealth called Marquita Grasty as the only testifying witness. Ms. Grasty's identification of [Appellee] was stipulated between counsel as Ms. Grasty and [Appellee] share a child. Ms. Grasty testified that she and [Appellee] have known each other since 2011, dating on and [off] for approximately six years. Ms. Grasty gave birth to their child in 2017, and officially

_____

[*] Retired Senior Judge assigned to the Superior Court.

ended the relationship with [Appellee] in 2019. Over the course of her relationship with [Appellee], Ms. Grasty began dating the Decedent on and off in 2016. [Appellee] was aware of this relationship.

On the night of December 29, 2020, Ms. Grasty was at home where she called the Decedent a Lyft at approximately 10:00 p.m. While Ms. Grasty intended to send a screenshot of the Lyft ride to the Decedent, she accidently sent the screenshot to [Appellee], and her mother. [Appellee] responded to the text message asking if Ms. Grasty would speak on the phone. [Appellee] further stated that Ms. Grasty would not speak to him since the Decedent would be at her home. Ms. Grasty replied to [Appellee's] message, stating "Mr. Anderson was coming to get something out of her car and then going home."

The Decedent arrived at Ms. Grasty's home at approximately 11:00 p.m. [Appellee] texted Ms. Grasty stating, "he was going for a walk." Ms. Grasty did not respond. The Decedent was inside Ms. Grasty's home for a few hours before leaving to sleep in Ms. Grasty's Honda Accord, parked in the rear of her home. To Ms. Grasty's knowledge, people did not usually travel in the back area of her home, but [Appellee] had previously been in that area. When the Decedent left to sleep in the car, Ms. Grasty went to her bedroom to go to sleep. Overnight, Ms. Grasty woke up to the sound of four gunshots. Ms. Grasty sent a text message, checking on the Decedent. Without receiving a response, Ms. Grasty went back to sleep under the assumption the Decedent was still asleep. At approximately 7:00 a.m. Ms. Grasty walked outside to find the Decedent sitting in the car, covered in blood. Counsel further stipulated that if Officers McDonna and McCabe were to testify, they would attest to arriving at 1109 Rosalie Street on December 30, 2020 at approximately 7:39 a.m. where they found the Decedent sitting in a gray Honda Accord with gunshot wounds to the face.

A video compilation created during the investigation was presented at the preliminary [hearing]. Ms. Grasty was previously shown the video during an initial interview with the homicide unit. While on the stand, Ms. Grasty viewed the same video with the inclusion of additional angles.

- 2 -

Testifying to the video compilation, Ms. Grasty identified [Appellee] as the individual seen walking on Summerdale Avenue. Despite defense counsel objections, Ms. Grasty's identification of [Appellee] was admitted. Ms. Grasty further testified that she was able to accurately identify [Appellee] based on familiarity with his general demeanor due to their long-term relationship. Although [Appellee] knew Ms. Grasty to park her car behind her home, Ms. Grasty testified that [Appellee] would not have known the Decedent was sleeping in her car. Ms. Grasty initially said that she did not know [Appellee] to own a gun but attested to his history of violence. In 2019, [Appellee] choked Ms. Grasty during a domestic altercation. Ms. Grasty originally testified that [Appellee] did not make any comment regarding her relationship to the Decedent during the incident, however, upon refreshing her recollection with a police statement, it was established that [Appellee] wrote in a letter to Ms. Grasty "while I was choking you, all I saw was your boyfriend [Decedent]." Further testimony based on the prior statement revealed that Ms. Grasty was aware [Appellee] owned a firearm that he stored in his basement ceiling.

On cross examination, Ms. Grasty testified that multiple residents regularly parked their vehicles in the alley located behind her home. Ms. Grasty was aware that the Decedent was charged with dealing drugs and carrying an illegal firearm but was unaware of his involvement at the time of his death. Ms. Grasty admitted that there was nothing specifically unique about [Appellee's] walk to make it identifiable, nor had [Appellee] suffered an injury that would make his walk distinctive. The only time [Appellee] went to Ms. Grasty's home at night was upon his release from jail in 2020 to pick up their son.

Lastly, counsel stipulated to the video compilation which is summarized as follows: The video, time stamped at approximately 5:45 a.m., shows an individual walking down Summerdale Ave. toward the back alley where Ms. Grasty's parked vehicle is located. An individual is seen dressed in plain, dark, clothing and black shoes. Video surveillance from a private residential home located on Rosalie Street, showed the individual entering the alleyway and walking in the direction of the gray Honda Accord. The individual

proceeds to investigate the vehicle and remove a firearm from his jacket pocket. Surveillance shows the individual walking around the car with the firearm in hand. The individual then walks to the other side of the alleyway, out of view of the camera. Approximately [two] minutes lapse, and the individual walks past the car again without the firearm present. The next camera angle shows the individual standing at the Summerdale Ave. entrance to the alleyway for several minutes. After, the individual returns to the alley he is seen walking towards the car, with the firearm in hand. The individual approaches the car, looks inside, and proceeds to fire [three] gunshots into the car. The individual then runs out [of] the alley toward Frontenac Street. The video surveillance concludes on Frontenac Street showing the same individual dressed in dark clothing exiting the alley way and running up the street.

(Trial Court Opinion, filed 3/17/22, at 2-5) (internal footnotes and record citations omitted).

At the conclusion of the preliminary hearing, Appellee was held for court on charges of murder, carrying a firearm without a license, carrying a firearm on public streets in Philadelphia, and possessing instruments of crime ("PIC").[1] On September 22, 2021, Appellee filed a motion to quash the charges. In it, Appellee argued that the Commonwealth "failed to establish a *prima facie* case" as to any of the charges. (Motion, filed 9/22/21, at ¶3). The court conducted another hearing on November 17, 2021. That same day, the court granted Appellee's motion and dismissed all charges. Specifically, the court determined "that the Commonwealth failed to establish a *prima facie* case of identity." (N.T. Pretrial Hearing, 11/17/21, at 5).

_____

[1] 18 Pa.C.S.A. §§ 2502, 6106, 6108, and 907, respectively.

- 4 -

The Commonwealth timely filed a notice of appeal on December 7, 2021. On January 4, 2022, the court ordered the Commonwealth to file a Pa.R.A.P. 1925(b) concise statement of errors complained of on appeal. The Commonwealth timely filed its Rule 1925(b) statement on January 18, 2022.

The Commonwealth now raises one issue for our review:

> Did the [trial] court err in ruling that the evidence was insufficient to establish a *prima facie* case that [Appellee] committed the crimes charged, where [Appellee's] ex-girlfriend—who had known him for more than eight years—identified him from a surveillance video as the person who repeatedly shot the victim as he lay sleeping in a car parked in an alleyway behind her house?

(Commonwealth's Brief at 4).

The following principles apply to this Court's review of an order granting a pretrial petition for writ of *habeas corpus*:

> We review a decision to grant a pre-trial petition for a writ of *habeas corpus* by examining the evidence and reasonable inferences derived therefrom in a light most favorable to the Commonwealth. Whether the Commonwealth satisfied its burden of establishing a *prima facie* case for each charged crime is a question of law, to which this Court's standard of review is *de novo* and our scope of review is plenary.
>
> A pre-trial *habeas corpus* motion is the proper means for testing whether the Commonwealth has sufficient evidence to establish a *prima facie* case. To demonstrate that a *prima facie* case exists, the Commonwealth must produce evidence of every material element of the charged offense(s) as well as the defendant's complicity therein. To meet its burden, the Commonwealth may utilize the evidence presented at the preliminary hearing and also may submit additional proof.

***Commonwealth v. Wyatt***, 203 A.3d 1115, 1117 (Pa.Super. 2019) (internal

citations and quotation marks omitted).

On appeal, the Commonwealth emphasizes Ms. Grasty's preliminary hearing testimony identifying Appellee as the individual depicted in the surveillance video. In support of this identification, the Commonwealth reiterates that Ms. Grasty "was intimately familiar with [Appellee's] appearance, gait, and demeanor because she had known him for nine years, dated him for six years, and had a child with him." (Commonwealth's Brief at 12). To the extent that the trial court found Ms. Grasty's testimony unconvincing, the Commonwealth insists that the court made "an improper pretrial credibility determination." (*Id.* at 13). The Commonwealth concludes that it presented a *prima facie* case as to each of the criminal charges, and this Court must reverse the order granting Appellee's pretrial motion. We agree.

"The purpose of a preliminary hearing is to determine whether the Commonwealth has made out a *prima facie* case for the offenses charged." **Commonwealth v. Ouch**, 199 A.3d 918, 923 (Pa.Super. 2018).

> The preliminary hearing is not a trial. The principal function of a preliminary hearing is to protect an individual's right against an unlawful arrest and detention. At this hearing the Commonwealth bears the burden of establishing at least a *prima facie* case that a crime has been committed and that the accused is probably the one who committed it.
>
> *    *    *
>
> In addition, the evidence should be such that if presented at trial, and accepted as true, the judge would be warranted in allowing the case to go to the jury. The standard clearly

- 6 -

does not require that the Commonwealth prove the accused's guilt beyond a reasonable doubt at this stage. **Most significant in this appeal, the weight and credibility of the evidence is not a factor at this stage.**

*Commonwealth v. Hilliard*, 172 A.3d 5, 10 (Pa.Super. 2017) (emphasis added; internal citations and quotation marks omitted). "Inferences reasonably drawn from the evidence of record which would support a verdict of guilty are to be given effect, and the evidence must be read in the light most favorable to the Commonwealth's case." *Ouch, supra* at 923 (quoting *Commonwealth v. Marti*, 779 A.2d 1177, 1180 (Pa.Super. 2011)).

Additionally, the Pennsylvania Crimes Code defines first-degree murder as follows:

**§ 2502. Murder**

**(a) Murder of the first degree.**—A criminal homicide constitutes murder of the first degree when it is committed by an intentional killing.

18 Pa.C.S.A. § 2502(a).

To find a defendant guilty of first-degree murder a jury must find that the Commonwealth has proven that he or she unlawfully killed a human being and did so in an intentional, deliberate and premeditated manner.

It is the element of a willful, premeditated and deliberate intent to kill that distinguishes first-degree murder from all other criminal homicide. …

The *mens rea* required for first-degree murder, specific intent to kill, may be established solely from circumstantial evidence.

*Commonwealth v. Schoff*, 911 A.2d 147, 159-60 (Pa.Super. 2006) (internal

citations and quotation marks omitted).

The Crimes Code also defines the offense of PIC as follows:

**§ 907.  Possessing instruments of crime**

**(a)  Criminal instruments generally.—**A person commits a misdemeanor of the first degree if he possesses any instrument of crime with intent to employ it criminally.

\*     \*     \*

**(d)  Definitions.—**As used in this section, the following words and phrases shall have the meanings given to them in this subsection:

\*     \*     \*

**"Instrument of crime."**  Any of the following:

(1)  Anything specially made or specially adapted for criminal use.

(2)  Anything used for criminal purposes and possessed by the actor under circumstances not manifestly appropriate for lawful uses it may have.

18 Pa.C.S.A. § 907(a), (d).

The Uniform Firearms Act provides, in relevant part, as follows:

**§ 6106.  Firearms not to be carried without a license**

**(a)  Offense defined.—**

(1)  Except as provided in paragraph (2), any person who carries a firearm in any vehicle or any person who carries a firearm concealed on or about his person, except in his place of abode or fixed place of business, without a valid and lawfully issued license under this chapter commits a felony of the third degree.

\*     \*     \*

**§ 6108.  Carrying firearms on public streets or public property in Philadelphia**

No person shall carry a firearm, rifle or shotgun at any time upon the public streets or upon any public property in a city of the first class unless:

(1)    such person is licensed to carry a firearm; or

(2)    such person is exempt from licensing under section 6106(b) of this title (relating to firearms not to be carried without a license).

18 Pa.C.S.A. §§ 6106(a)(1) and 6108.

Instantly, the record shows that Ms. Grasty first met Appellee in 2011, and she gave birth to his child in 2017.  (*See* N.T. Preliminary Hearing, 8/9/21, at 8-9).    After  providing  some  additional  context  for  this  years-long relationship, Ms. Grasty unambiguously identified Appellee as the individual depicted in the surveillance video:

[PROSECUTOR]:    Does Homicide then show you some video from the area around your house?

[WITNESS]:         Yes.

[PROSECUTOR]:    After you watch the video, do you recognize anyone in the video?

[WITNESS]:         Yes.

[PROSECUTOR]:    Who do you recognize in the video?

[WITNESS]:         [Appellee].

(*Id.* at 19-20).

Thereafter, the Commonwealth played a "compilation video," which

included images captured by several different cameras on the morning of the shooting. (*Id.* at 20). Again, Ms. Grasty identified Appellee as the individual in the video:

> [PROSECUTOR]: Ms. Grasty, can you see this individual walking?
>
> [WITNESS]: Yes.
>
> [PROSECUTOR]: Do you recognize that walk?
>
> [WITNESS]: Yes.
>
> [PROSECUTOR]: Whose walk is that?
>
> [WITNESS]: [Appellee].

(*Id.* at 23).

At that point, defense counsel objected and argued that Ms. Grasty's testimony was "not a reliable identification because of our inability to see" a clear image of the individual on the video. (*Id.* at 24). The court acknowledged that "[y]ou can't necessarily see who that is" in the video, but Ms. Grasty made a permissible identification "based on a walk." (*Id.*) When testimony resumed, the prosecutor confirmed that Ms. Grasty was familiar with Appellee's walk and his "general demeanor." (*Id.* at 25). Ms. Grasty also stated that she had seen Appellee wear clothing that was similar to the wardrobe worn by the individual in the video. (*See id.*)

Despite this evidence, the trial court determined that the Commonwealth failed to establish that Appellee was the individual depicted in the surveillance video. The court stated:

Here, evidence established that a premeditated, intentional killing amounting to first-degree murder occurred on December 30, 2020. However, the Commonwealth failed to [demonstrate] that Appellee was, more likely than not, the individual who was responsible for the killing. During the preliminary hearing, the Commonwealth presented a video compilation and stipulated to the summary. Although the video accurately depicts the events of the crime, lay witness identification of the individual shown was not sufficient given the lack of identifiable factors.

*    *    *

The video vaguely depicts an individual wearing dark clothing without identifying graphics or apparel logos. Additionally, the individual wore a hood, covering the head and a significant portion of the face. The face of the individual was not revealed in any of the varying camera angles presented.

*    *    *

Although circumstantial evidence may create a logical connection as to [Appellee's] motive, the witness identification based solely on her relationship with [Appellee,] in the absence of further corroborating evidence, is insufficient to establish that Appellee is responsible for the killing.

(Trial Court Opinion at 7-9).

On this record, we must disagree with the court's conclusion that the Commonwealth failed to provide an adequate identification of Appellee. Ms. Grasty's testimony definitively established: 1) she had known Appellee for years; 2) she was familiar with his appearance and demeanor; and 3) she believed Appellee was the individual depicted in the video. Under the totality of these circumstances, one could reasonably infer that Appellee was responsible for the shooting. **See Wyatt, supra**. The trial court's decision to

- 11 -

the contrary amounts to an impermissible evaluation of the weight of the evidence at the preliminary hearing stage. *See Hilliard, supra*.

Our review of the testimony produced at the preliminary hearing, viewed in the light most favorable to the Commonwealth and accepted as true at this juncture, leads us to conclude that the Commonwealth presented sufficient evidence to establish a *prima facie* case as to murder, PIC, and the firearms charges filed against Appellee. *See Ouch, supra*; *Hilliard, supra*. Accordingly, we reverse the order granting Appellee's motion to quash and remand this case for further proceedings.

Order reversed. Case remanded. Jurisdiction relinquished.

Judge Bowes joins this memorandum.

Judge Pellegrini files a dissenting memorandum.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 3/3/2023

- 12 -